## WISCONSIN GRANITE COMPANY

*v.*

## MICHAEL P. GERRITY *et al.*

*Filed at Ottawa, January* 19, 1893.

1. CREDITOR'S BILL — *essential allegations and proof.* In a creditor's bill for the purpose of reaching equitable assets of the defendants, and to subject them to the complainant's judgment, it is necessary to allege and prove that the complainant's remedy at law has been exhausted before the filing of the bill.

2. But when the real scope and effect of the bill is simply to set aside and remove out of the way of the complainant's execution upon his judgment at law, certain conveyances executed by the judgment debtor after he became debtor to the complainant, without any valuable consideration and purely voluntary, it is not necessary to allege and prove the exhausting of his legal remedy, but the creditor may file his bill as soon as he recovers his judgment.

3. FRAUDULENT CONVEYANCE — *a gift from a husband to his wife.* In this case a wife saved out of money given her by her husband for family expenses, $1,000, which she deposited in bank in her own name. Afterward, the husband needed the money to pay for property which he was purchasing, and she gave it to him, and still afterward, feeling

that his life was uncertain, he made two deeds to her of certain real estate, so that in the event of his death, the property should belong to her and their children. *Held*, that the transaction was totally wanting in the indispensable elements of a bargain and sale of the property, and was purely a gift to the wife by the husband, which, though good as between them, was fraudulent as to the existing creditors of the husband.

4. In such case, the fact that the husband retains other property, but which is not of sufficient value over and above the incumbrances thereon to satisfy the creditor's judgment, will not prevent the setting aside of the deeds to the wife as in fraud of the judgment creditor.

APPEAL from the Appellate Court for the First District; — heard in that court on appeal from the Superior Court of Cook county; the Hon. H. M. SHEPARD, Judge, presiding.

Messrs. TATHAM & WEBSTER, for the appellant.

Mr. C. M. HARDY, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

We are of the opinion that the courts below misconceived the scope and effect of the present bill. They assumed that it was a creditor's bill for the purpose of reaching equitable assets of the defendant and subjecting them to the payment of complainant's judgment, to sustain which it was necessary to allege and prove that complainant's remedy at law was exhausted before the filing of the bill. *Durand* v. *Gray, Kingman & Collins*, 129 Ill. 9, and cases therein cited. But its real scope and effect is simply to set aside and remove out of the way of complainant's execution upon its judgment at law, certain conveyances executed by the defendant after he became debtor to the complainant, without any valuable consideration and purely voluntary, and therefore fraudulent in law as against the rights of the complainant, to sustain which it was unnecessary to allege and prove the exhausting of its legal remedy before the filing of its bill, but it was authorized to file its bill as soon as it had recovered its judgment. *Miller* v. *Davidson*, 3 Gilm. 518; *Newman* v. *Willetts*, 52 Ill. 98;

*Weightman* v. *Hatch*, 17 id. 281; *Getzler* v. *Saroni*, 18 id. 511; *Beebe* v. *Saulter*, 87 id. 518.

The evidence is quite clear that Mrs. Gerrity had no separate estate out of which she could have paid for the property conveyed to her by her husband, the defendant in the execution. Her testimony is only that she had got money from her husband for household expenses, from time to time, and that she saved, out of those amounts, $1000, which she had deposited in bank to her credit, and that afterward she gave her husband her bank-book, and he drew out the $1000, and that that was in payment for the property conveyed to her. No specific contract is described as having been made between them, nor does she pretend to know whether the property was of equal or greater or less value than $1000. Her questions and answers proceed thus: Q. The conveyance made in May, 1889, the conveyance of a large portion of the property mentioned and described in this bill, do you remember anything about that conveyance? A. No, I do not; I remembered it at the time, I suppose, and have forgotten it probably. Q. When did you first learn that it had been conveyed to you? A. Which do you mean, this property? Q. This property, yes; I do not refer now to the homestead; the rest of the property. A. Yes; well, I really do not know just when; of course Mr. Gerrity notified me at the time, and I could not specify any date though. Q. You don't know whether it was in May, 1889, or whether it was in 1890? A. No, sir; I do not. Q. Or whether it was a year before that? A. I do not. Q. Did you ever see the deed for the property, conveying it to you? A. That I could not say, either. Q. Do you know how it came to be conveyed to you? A. Yes, sir. Q. Well, how? A. Well, Mr. Gerrity hadn't been feeling very well, and I think that he wanted to feel sure that if anything happened, that both my little ones and I would be seen and cared for, and I think that was the motive — and I know in fact that actuated him to do so. Q. Did he state to you that was his motive? A. He may not

have done so in so many words, but I know the man was very sick. Q. Never mind what you know. What did he state to you? A. No; he did not. Q. Did he say anything to you at the time this conveyance was made? A. He may have; and still I may have forgotten it. Q. You do not remember, distinctly, of any conversation in regard to it? A. I do not remember, distinctly, what was said. Q. Do you know how much the property was actually worth at the time it was conveyed to you? A. No, sir; I do not. Q. Do you have any idea? A. I have none. Q. Anything said to you by Mr. Gerrity at the time about how much it was worth? A. No, sir. Q. You have no idea? You didn't ask any questions, did you? A. I asked no questions, for I had implicit confidence and took everything just as it was. Q. You did not consider that you were purchasing that property for a valuable consideration? A. I did not think anything about that. Q. After the property was conveyed to you did you have anything to do with regard to the management of it? A. No, sir; I authorized my husband to do so. Q. Did you do anything more with regard to the management of it than you did before it was conveyed to you? A. Nothing. Q. Did you ever receive any rents for this property after it was conveyed to you? A. Not only secondary. I authorized Mr. Gerrity to attend to these lots directly. Q. Did you ever sign any leases or do anything with reference to the management of the property? A. Not to my knowledge.

The defendant's version of the transaction is thus given in his examination as a witness:

" The amount of the consideration for the conveyance to Mrs. Gerrity of the various pieces of property, except that one conveyed on her wedding day, was about a thousand dollars, somewhere in the immediate vicinity of a thousand dollars. She gave me the bank-book with the orders to go down to Mr. Christoph's bank and get the money. At the time that I purchased this piece of ground that lay next to her house, I was

doing business in the bank myself at the time, and with her endorsement was all I required to get the money, and I did get it out of the bank. That is the consideration, that money that I owed her, that I considered it in this deed. She gave me that money to buy this property, in other words, in the neighborhood of a thousand dollars — that was the amount. Now, why I made this conveyance, that of course, I will go into if you want it. Q. What was the condition of your health at that time, Mr. Gerrity? A. I was recommended to join an insurance society here, a benevolent insurance society, and the doctor rejected me for heart disease — that is the Royal Arcanum, and the day after I got notice of being rejected, I made this deed to her with that consideration, if anything should occur she had the property, what might be in it, for her and for our children, and that is the only consideration." And on re-cross-examination he said: "The principal reason why I conveyed the property to my wife was because I was feeling unwell at that time, and I wished to make provision for my wife and family if there was anything in it. About a thousand dollars she had given me formerly. The chief consideration, after giving back the money she had given me, was in case anything happened to me, my wife and family might be cared for. I have paid off some of the incumbrances. Most of them still remain. I told parties they could sell this property once since I conveyed it to my wife."

The substance of the entire testimony on this question amounts to no more than this: Mrs. Gerrity saved out of money given her by her husband for family expenses $1000, which she deposited in bank in her name. Afterward her husband needed the money to pay for property which he was purchasing, and she gave it to him. And still, after that, feeling that his life was uncertain, he made two deeds to her of property in controversy, so that, in the event of his death, the property should belong to her and their children. That this is totally wanting in indispensable elements of a bargain and sale is too

plain for argument. It was a gift, pure and simple, from Gerrity to his wife, and nothing else.

As between the parties, the conveyances are undoubtedly good, but as to these existing creditors it is different. If the effect of the conveyances was to hinder and delay them in the collection of their debts, then, as to such creditors, the conveyances are fraudulent and of no effect. It is true that it is shown that Gerrity had property, known as the " Grand Crossing Property," of considerable value, which was not included in these deeds, but that property was subject to an incumbrance placed upon it by Gerrity, in the shape of a mortgage for $555, upon which $50 of interest is due, and it is also incumbered by the lien of a judgment against Gerrity in the Criminal Court of Cook county for $2000, which incumbrances, under any view of the evidence as to the value of the property, do not leave an amount in value that can be realized from this property sufficient to pay complainant's judgment.

Necessarily, therefore, the effect of these conveyances was to hinder the complainant in the collection of its debt. The Appellate Court, therefore, erred in affirming the decree of the Superior Court dismissing complainant's bill.

The judgment of the Appellate Court is reversed, and the decree of the Superior Court is also reversed, and the cause is remanded to the Superior Court for further proceedings consistent with this opinion, in which each party shall be allowed to introduce additional evidence, if it shall be so desired.

*Judgment reversed and cause remanded.*